The first case of the afternoon is Central Management Services v. Illinois Labor Relations Board for the appellant, Mr. Weiner, and for the faculty, Mr. Bowe, and Mr. Pearson. Can you split your time and inform the clerk? Thank you.  May it please the court. First, I might say this is probably one of our last cases. I mean, we have a few more in the hopper. I want to thank the court for its indulgence and understanding. I think the court has created a roadmap for everyone involved in these types of proceedings to follow. I wish I had had it before these cases, but nevertheless, we appreciate that. It's a privilege being here. And I just want to say that if in any way I've ever offended the court or any of the justices, I'm extremely sorry about that. We're not very thin-skinned. But I apologize nevertheless. So, counsel, you're representing to us that this is the last of these kinds of cases. Well, I think there's two more in the hopper, but I don't know. Events may transpire. We'll look forward to those with keen anticipation. Me, too. We should all pray. This, and I would like to withdraw the preponderance argument as it relates to the, you know, the words state employees notwithstanding, because the court has both spoken in the Secretary of State's case as well as in the engineer's AD case. For the DPH. So I would withdraw that argument for consideration. Now, this case, following that roadmap, this case, I believe, falls squarely within the parameters established by this court in the DPH, SPSA, 8H case of which you, Justice Appleton, were the author of. Justice. And I believe it falls within the PSA Option 2 case. And it also is in the Option AD case that was authored by Justice Polk. And without long citations, Your Honor, if Your Honor, Judge Justice Knett, without long citations, three sentences, I would just like to iterate what was contained as with respect to the standards this court has set for determining whether or not an employee directs his subordinates under the law. And I first turn to just the one sentence I'm going to read by Justice Appleton in the DPH, SPSA Option H case, 201204209. In paragraph 28, quite extensive, I'm not going to go through all of it. The authority direct involves functions relating to the overseeing an employee's operations or which indicate responsibility for the performance of a subordinate's work. These functions include reviewing and monitoring work activities, instructions on how work is to be performed, scheduling work hours, assigning work, and approving requests for leave or overtime, and completing performance evaluations. I won't go into any further because I don't want a long citation. But that is determinative. That language, I respectfully assume, is determinative in this case. When Justice Stiglitz says that he was referring to the authority to independently assign and monitor work, evaluate employees, and approve time off for his subordinates, satisfies the requirements of having exercising independent judgment and directing employees under the act. Paragraph 201. And lastly, one more sentence, Your Honors. In Justice Pope's language, supervisory authority to direct subordinates, contained in paragraph 63 of that opinion, what might be done as far as the inspections, as far as her field group, what they're going to be doing this week, next week, and what needs to be done as well as what might need additional funding, constituted the indicia of directing subordinates under the act. And this case involves the field techs for the Illinois Department of Transportation. These are the people. These are the very people that are responsible for the day-to-day planning, organizing, coordinating, and inspection of IDOT's field operations in maintaining our highways in this state. They're responsible for all of it. They're the ones that go out, that get calls, that get communications from which there are reports of road conditions, of guardrails, of potholes, of buckling cement, of whatever that may impair the safety of the motorists in this state. These are the guys that go out and determine what work needs to be done. And then what do they do? They direct. They direct and assign the repairs and the installations to the lead workers and what they call, I don't know why, lead workers, who are their immediate subordinates. Counsel, the assign and monitor language that you cited a few moments ago, is that one of the 11 functions enumerated in Section 3R? No, that comes under directing. When you assign somebody something... So the assign and monitor refers to directing as compared to what do the Section 3R factors represent? Well, I would approach it from the other side. Directing encompasses a number of activities, one of which is approving overtime, one of which is monitoring work, one of which is assigning work, one of which is entering performance evaluations, which in essence direct the employee to change their conduct in the event they're... or even if they're favorable. Directing is a composite, as set forth by Justice Appleton. Those are the criteria under paragraph 28. All those functions as a composite determine whether someone directs or doesn't. And I think they're all here. More or less, you know, I think the evidence is sufficient to conclude that the board was clearly erroneous in finding that they didn't direct employees. I guess that's the best way to say it. So if I may, also lastly, these field technicians supervise from 20 to 60 lead and lead-lead workers. So they supervise a lot of people, and so they're finding the work, they're assigning it, they're directing that it be done, and then they come back and they review it and they inspect it and they see if the work's done properly. And in the winter, they're out there all the time. There are 700 highway maintenance people that come under the lead and lead-lead workers, and then there are 1,500 snowbirds that are added during the winter season. So this is throughout the state. District 1 is the Chicago and Chicagoland area. Districts 2 through 9 are the rest of the state. It's the whole state. So these people perform that function. Now, if I may just review the evidence in each of these areas for you and then hopefully answer any questions, feel free to ask me at any time. But the testimony established, and they call these people yard techs, too, but they're really field technicians. The yard tech's responsibility includes completing timesheets, scheduling work for the lead or lead workers, time-off requests, performance evaluations, filling out rule and fraction forms, and dealing with other employees. The yard tech's job duties consist of inspecting the crews and what the work crews are accomplishing, responding to citizen and legislative inquiries, looking for work that needs to be completed, and prioritizing that work. Transcript 233. And that's a quote actually from the Attorney General's brief, as are most of what I'm going to be talking to you about. Of the prongs, the parties have stipulated that their work is substantially different, so that's going on. Regarding evidence of direction, I've already mentioned to you that regarding inspection of damages and repairs and ultimately to verify the damage was prepared. They approve leave requests. They approve overtime. They determine, and they can deny overtime. And they determine, even though overtime is based on operational needs, they determine whether it's needed and the amount of overtime that's needed. So it's not a pro forma thing. It is pursuant to the collective bargaining regime, don't get me wrong. But whether it occurs and to the extent that it occurs are decisions made by these people. They determine the need for, and also third, the scheduling of overtime. So they have three independent discretionary choices, as one must have. And in fact, the union's brief said, the architects are the individuals who determine if overtime is needed. Field technicians instruct their lead workers to mobilize at a certain time and with a certain amount of manpower. They may assign work even to their subordinates. So that's basically the directing aspect. I think the evidence clearly establishes that these field technicians direct their employees. They consult with their lead workers each morning. They prioritize their work. They determine which work is to be done and not done, where it's to be done, how it's to be done. Enough of that. Regarding the grievances, it's undisputed that the field technicians are the first step, which is an optional step, but it's the first step of the grievance procedure. Now they don't have, so the first step can involve an oral reprimand, which is this one. It also can involve proof status, which I'll get to a little later. But they do not have the authority to resolve grievances relating to discipline, but they resolve other grievances under the collective bargaining agreement relating to other matters, primarily call-out procedures. And while they do not have the authority to change payroll records, they may attempt to resolve a grievance due to a mistake in call-out procedures by notifying personnel that the employee should be paid for the lost time. If a field technician is able to resolve the grievance, it is unnecessary to fill out a form. However, if the field technician cannot resolve his subordinate's grievance, he must fill out a pre-printed form indicating grievance has not been resolved. Also, field technicians are involved in the pre-disciplinary, or may be involved in the pre-disciplinary hearings, and the evidence establishes that they may even be called, by the way, representing management in those pre-disciplinary hearings. And they also, in the grievance procedures, if it gets to arbitration, there's evidence that they may participate in that arbitration against the union. Talking about discipline, again, they do not independently issue discipline, but they are responsible for reporting all rule and policy infractions or incidents. And they also not only are responsible, they are, the union stipulated to the fact that the yard text on transcript 355, that the yard text may fill out reports with the facts surrounding an alleged incident, and at times, these investigations may result in discipline. So they're basically also, when it comes to misconduct or malfeasance or inappropriate manners or discipline rule infractions, they do the investigations, they report them to their superiors, which are the field engineer and the operations engineer above that. And they supply those records. They have a notice of rule infraction. Now that notice doesn't have any space for recommendation of discipline. I want the court to be clear about that. But it's a preliminary step in terms of the administration of discipline. It identifies who, what, and this is evidence, who, what, when, where, why, and how of a particular incident. They also, in districts other than District 1, they write emails or memoranda regarding incidents or rule infractions. They don't always use that form. So the other thing is with proof status, and it's clear what proof status, you're familiar with it. In Districts 2 through 9, field technicians may place highway maintainers on, quote, proof status, close quote, if they suspect a possible abuse of sickness. In District 1, it's done by a lead worker. It's not done by, or I think it may even be done higher up than that, as to the actual placement on proof of service. But it's the field technician that makes the determination independently as to whether or not he believes there's been an infraction or been a violation of the sick leave. He doesn't make the decision in District 1, but he does make the decision in Districts 2 through 9. While we're at it, let's talk about evaluations. The field technicians may complete work performance evaluation forms for highway maintainers and full-time temporary employees known as snowbirds. For the snowbirds, if they don't get a positive evaluation, they're not put on the recall list for rehiring. Now that determination is made by the field tech supervisor, because there's no place, either there's no place where they're instructed not to give a recommendation. But their evaluation is submitted. And based upon their evaluation, if it's not a positive evaluation, then they're not going to be recalled. So they can affect the actual employment of the snowbird or temporary employees, probationary employees. For the non-probationary employees, the evidence is very clear, that performance evaluations could be used to withhold a step increase. And that actually, the witness testified, the District 1 witness testified, that that actually happened. Although not many times. Counsel, are the field engineers in the union? Yes. And that field engineers in the hierarchy are actually above the field technicians, right? Correct. Tell me how that works. Well, we've had this discussion a couple times, but I'm not, I could explain that. The higher up you go, you may have fewer subordinates to deal with. You may not be actually in a supervisory position. You may segue into a managerial position. So the fact that, you know, but if you're not, quote, a manager, which as you know has a high burden to prove managerial status, you can very well have someone under you like these people who, again, supervise from 20 to 60 people. But the field engineers may not, you know, may not supervise that many people or may not meet the criteria for supervision and or managerial. So the fact that they're in the union above them is an anomaly. I agree with you. It was done voluntarily by IDOT. The people below them are in the same union, too, by the way. And that was done voluntarily. I wasn't around for that. Well, the field engineers are teamsters, right? Correct. And the employees we're talking about would want to be engineers. Local, yeah. Right. Right. Okay. I mean, I don't see the fact that because they voluntarily recognize these people who may not have qualified for any exclusions, it doesn't mean that these lower people who supervise massive amounts of people and actually are doing the work, I mean, the physical work, these guys are out there, you know. Your time is up. I'm done. Thank you. I'll address, all right. I get the message. I know the message. Happy New Year, by the way. Good morning, Your Honors. Afternoon, Your Honors. May it please the Court. My name is Sunil Bhawe, and I'm here on behalf of the Labor Relations Board. And I'm here with the Correspondence Council, Mr. Dale Pearson. And we've agreed to split up our time where I will take issues relating to the authority, to discipline, and the adjustment of grievances, as well as the preponderance of time element if the Court has any questions on that element. And Mr. Pearson will take the issues relating to authority to direct. As long as the Board's factual findings are supported by the record, then those findings should be affirmed. And here I think there's more than enough evidence to show that the field technicians do not possess the authority to discipline. In fact, I think this was pretty, almost conceded by counsel for CMS. What the field technicians do is they fill out this Notice of Rule Infraction form in District 1 and in Districts 2 through 9. They submit electronic emails to their superiors, advising the superiors of potential misconduct, the who, what, where, when, why, and how of potential misconduct. And the precedent states that reporting misconduct is not the same as issuing discipline. In fact, the evidence discloses that the one field tech who actually did attempt to impose discipline he was disciplined for trying to attempt to impose discipline. I think that clearly shows that these field technicians do not possess the authority to discipline. They only possess the authority to advise superiors that somebody may be breaking IDOT's rules. And that's something that I think most employers would expect out of all of their employees. If you see someone committing a rule violation, in the interest of the employer, every employee has some duty to report instances of misconduct. Moreover, I think... Is the field tech's duty greater? There's nothing in the record to show that the field techs have some greater duty than the highway maintainers. Those forms that you just referenced. Who has access to them? All employees? The record does not bear that out. The record does bear out that field technicians do fill this out. And that's something that the board found. There's no dispute that the field technicians have the authority to fill this out. But this alone is not discipline. It's just a notice that misconduct may have occurred. Then that notice is sent up the chain of command. And discipline is ultimately issued after a multi-layered review process. And as CMS's counsel conceded, there's nothing on that notice of rule infraction form that allows a field technician to recommend discipline. Now all of the testimony from the field technicians was such that they do not possess the authority to recommend discipline. None of them have ever recommended discipline. None of them believe that they can recommend discipline. The Malavitis Memorandum that we cited in our brief, found at record sites C-1626 to C-1627, I think lays out the disciplinary process. And in that Malavitis Memorandum, which is a memorandum by the Department of Transportation advising as to how the disciplinary process works, it details that the operations engineer is the first step of recommending discipline. And that recommendation is then subject to review up the chain of command, all the way up to the Labor Relations Department. Now the field technicians testified this is their role in discipline. They're advised by somebody from the personnel department, a personnel manager, one of their superiors, that a particular subordinate is going to be issued discipline. The field technician then prints out the notice of disciplinary action form, sits down with the subordinate, and tells the subordinate, I'm issuing this discipline to you because I'm being told to do so. Purely a liaison between management and the subordinate. This is what CMS claims is issuance of discipline. Physically handing the disciplinary paper to the subordinate. With respect... If the person who hands you the notice of discipline happens to be the same person that reported you, do you think the employee upon whom the discipline is being imposed thinks that that individual is part of the process and chain of the disciplinary structure? I don't believe so. Because the field technicians testified that they advise the subordinate that they are issuing this discipline because I am being instructed to do so. So the employees, whether or not that's even relevant to the Section 3R analysis, the subordinate employees would have no reason to believe that the field technician is exercising any independent judgment in actually imposing discipline against the subordinate. He's simply being instructed to do so, ordered to do so, by management. With respect to the issue of grievances, I do want to address the point that this issue has been forfeited in our opinion. Because there's no development of this argument in CMS's brief. They mention it briefly in their Statement of Facts section, nothing in the Arguments section. If the Court chooses to review this issue, precedent holds that adjustment of grievances relating to minor and routine matters do not rise to the level of supervisory authority. It is not primarily, I think CMS's counsel said, it's primarily call-out procedures that the field technicians deal with grievances. It's only call-out procedures. And even then, they're only an optional step in the grievance process. And even if they do believe that there is a problem with the call-out procedure and that a subordinate is entitled to hours worked that he did not get, they have absolutely no authority to grant that extra pay or extra hours independently. They have to contact the personnel office and get authority from the personnel office. And I think that goes to the heart of a lack of independent judgment to adjust a grievance. They cannot, on their own, adjust these grievances. Finally, I know we did not discuss the preponderance of element during CMS's opening argument, but to the extent that the Court will review that, we have filed a motion to submit supplemental authority that we just filed on Monday. This Court recently published a Rule 23 order authored by Justice Connect past Friday on January 4th. And I think that analysis in that Secretary of State case lays out beautifully the preponderance of time analysis. Did I understand you correctly to say you want to cite a Rule 23 case? It's not a Rule 23 case anymore. The Court recently published it on January 4th. I apologize. It was a Rule 23 case. We did not rely on it. But now we have filed a motion to relieve, to supplement the authority because it has been published. In that case, the Court, I think, very beautifully analyzes the level of evidence, the burden of proving that the preponderance of element time is satisfied. CMS cannot simply come to an administrative agency, the Labor Board, or to this Court and say, well, we had a witness testify that one particular field technician or two particular field technicians spent 50% of their time or more assigning work. That's not sufficient. There are 90 field technicians in this group. In that case, there was only one witness that was testifying. Here, the evidence relating to the preponderance of time element concerns only two of the 90 field technicians. Moreover, the assignment of work standing alone, that's not supervisory authority under the Act. And this Court in the Secretary of State case, and also County of Vermilion some 15 years back, stated that there's a particular legislative formula that has to be confirmed to. Assignment of work constitutes authority to direct under direction under the Act, only if it affects the terms and conditions of the subordinate's employment status, and then also if the petition for employees exercise independent judgment. There's just a dearth of evidence as to whether these field technicians exercise independent judgment when assigning work for X amount of time during the day. So it's a burden of proof issue, and I think that Secretary of State's case really lays everything out. If there are no other questions, I will concede the rest of my time. I had one question. Going back to the discipline, why isn't the authority to place snowbirds on proof status a form of discipline? It would seem to be to me. Right. Before I answer that question, I do want to also state that that issue, we believe, has also been forfeited. If you read the Board's decision, the Board never actually reached the issue of proof status. And the reason for that is CMS never briefed it in the post-hearing briefs, so the ALJ never ruled on that. There was nothing about proof status in the exceptions filed with the Board, so the Board actually never reached that decision. To the extent that this Court will consider proof status, the analysis there falters on lack of independent judgment. CMS's witnesses have testified that the field technicians are not well-versed in the collective bargaining agreement between IDOT and the subordinate employees. They have to go through a thorough review process to look back at a history of abuse of sick time that may be in place before proof status can actually be implemented. What the field technicians do is they can raise, again, report potential misconduct. I suspect that this highway maintainer is abusing his sick time. Then there's a multi-layer review process to go back and look at any previous abuses of sick time that that highway maintainer or subordinate had before the proof status determination is made. And the field technicians are not independently putting people on proof status. Thank you.  Thank you, Your Honor. May it please the Court, my name is Dale Pearson. I represent Local 150, the Operating Engineers. I'll take whatever time is left to address initially the directing of the work, 3R criteria, and any other questions, of course, that the Court may have. I think, Your Honor, it is worthwhile to review at least briefly what it is that these field technicians do. The actual job classification name is Engineering Techs 4, 5, and 6. The Board refers to them as field technicians. Throughout our brief, we call them yard techs. I think that's what the parties and the people themselves refer to themselves as. So if I go back and forth, we'll talk about those people or what the subject of this is. The Board found they were a proper bargaining unit. They themselves, the yard techs, do not do the actual repair work on the state roads. It's the highway maintainers who are actually doing the repair work, pothole repair, cracks, pavement cracks, that sort of thing. And then it's the lead workers and the lead lead workers who actually hand out the assignments, direct who does what when, and monitor the work. What the yard techs are basically doing is taking the complaints from the public, from legislators, from other officials, whether they be by email, by letter, by phone call, investigating these complaints, locating the spot where the work has to be performed, and then passing that information along to the lead lead workers with a certain amount of prioritization. Now, I think it's important to recognize that we are talking about different categories of work. The highway maintainers are doing a lot of basic road maintenance. The guardrail work, work on culverts, work on the linear posts, when those things are damaged, that is primarily subcontracted to outside vendors, if you will, contractors who actually do that work. So to the extent that the yard techs are evaluating or monitoring that work, they're doing it to make sure that the work is accomplished and then so that they can approve invoices to these third parties. That has nothing to do with overseeing or supervising actual state employees. So this guardrail work, et cetera, is actually a large class of work. So I'm to understand by your argument that the maintainers don't do guardrail work? I don't think this record shows that, Your Honor. I think that's mostly subcontract work. And I think that the board found that the guardrail work, this inspection, evaluation, identifying the problems is like the lion's share of their responsibilities. And the board says that the majority of their work is addressing permit requests, guardrail damage claims, other calls for complaints. When you look at sort of the day in the life of one of these field technicians, you know, they're assigned a truck because they're on the road a lot. They come into work. They check e-mails. They check regular mail. They check phone messages. They're looking for what are the complaints that have to go investigated. That takes several hours in any given morning. They then hit the road. They go out and find where are these places located. Where are the potholes? Where is the guardrail damage? To the extent, then, that they pass that information along in a priority of what comes first to the lead workers, I think it's fair to say, Your Honors, that what we're talking about is this pothole is bigger than that pothole. We better fix this one before you fix that one. That is not independent judgment. That's an IDOT guideline. That's, you know, a healthy dose of common sense. But most of the work that the yard techs do, most of their time is on-the-road type work. They're covering vast territories. The entire state is divided into nine districts. In the downstate districts, we're talking about fairly large geographic areas. When you're up in the Chicago suburban area, it's less large geographically, but, of course, there's a lot more traffic. So when they're doing their work, their average work of the average day, they're most of the time by themselves. They're not directing people. They're not assigning work. They're not monitoring the work of other individuals. Because a large part of their work is clerical, they are passing orders along, up and down the ladder, if you will. There is a role here for some of this paperwork. But it's not the kind of independent judgment. It's not the kind of directing or assigning work that a supervisor engages in. The record is clear, and the board found that it's the lead workers and the lead lead workers who are actually the on-site people who are doing the work of the highway repairs along with the highway maintainers. I think with respect to, Your Honors, the overtime question, this is one area where I think it's fairly clear that, within the case law, there is discretion and then there's not discretion. I mean, as a practical matter, what happens is you've got highway maintainers and lead lead workers out on site. They're doing the work. The first responders are the ones who get the overtime. I think what happens really is just, we're not done yet. Do we keep going or not? Well, the question then is, well, you've got to keep going. However, it's within IDOT guidelines. Whenever it's within the guidelines of the agency, it doesn't involve the independent judgment that is required to find supervisory status. The architects cannot approve overtime more than 10 hours. They've got all these restrictions on what their role is in overtime. Nor do they decide who gets it. That is all a creature of the collective bargaining agreements between the Teamsters Union, that represents the bargaining unit of highway maintainers and lead workers, and IDOT management. It's that contract that establishes overtime equalization lists, and it's from those lists that the individual people are drawn. Again, it's mostly a lead worker who's doing that. I did want to touch on that one anomaly question because this is somewhat unusual. I don't know that I've ever experienced it, but you do have a situation here where you've got the highway maintainers and the lead and lead workers are represented by one Teamsters unit. They're in a separate bargaining unit. The yard techs are, until now, this procedure, unrepresented. But then the people that the yard techs report to, that is the field engineers, they are also part of a bargaining unit represented by Teamsters. Now, IDOT doesn't raise this, and it's probably obvious, but you don't have all these conflict of interest problems because these people are, number one, in different bargaining units, and number two, hope to be represented by entirely different unions. But the idea that you've got, whether they were voluntarily recognized or not, a group above them that's organized to whom they report, and then all of a sudden they're like this island of supervisors, and then the people purportedly below them, I think that's actually a mischaracterization. But the fact that the lead and lead workers who actually do the work assignments, who do monitor work, who do determine who does what, they're not supervisors either. I don't think you can pin this sort of supervisory label on these yard techs. I think that these folks are mostly engaged in a clerical, they're in an inspection, they're quality control type of job. They're technicians. They aren't supervisors. They aren't directing other people's work. They aren't doing the indicia of supervisors. Recall, Your Honors, that the petitioners only raised three of the three-R criteria. They conceded that eight of the usual indicia of supervisory status were not involved in this case, that it was only about grievance processing, discipline, and the directing of the work. The board found that not only did they not engage in any of those indicia, but the board didn't even reach the whole question of the predominance, the preponderance, question, because the board found that they didn't engage in supervisory activity at all in the first place. Nevertheless, if the court was to actually get into that issue, the estimate by any of the employer witnesses was that yard techs don't do any supervisory activity more than 20 to 25 percent of the time in any given day. And the lack of actual contact with the highway maintainers and the lead workers, I think, indicates that in no way can you find that that third or fourth factor, depending upon what cases we're relying on, actually dictates that they're engaging mostly in supervisory activity. If there's no more questions, thank you for the opportunity, Your Honors. Thank you. Your final, Mr. Weiner. You know, a lot of what he said is exactly true, you know, not all necessarily is that, but these are the people that go out and find work that has, repairs that have to be, and assign and direct it to the lead and lead lead workers, who then in turn assign it and work with, they also work with. So the people doing the actual work, you know, are, how does that happen? It happens when these guys, one, determine whether a repair is necessary. Two, determine what priority that repair will be given. And three, figure out who will be doing it and when they'll be doing it. I mean, there's four different factors I just, off the top of my head, would say that they're involved and that the evidence supports. So that's what happens. It just doesn't magically happen. These guys are out repairing roads. They're directed and assigned to do that job. And, in fact, they come back and see if the job is done right, properly, and timely. So that's, there is oversight involved. There is monitoring involved. There is assignment involved. It meets the criteria. As far as preponderance is concerned, there's our analysis of preponderance in several places, but it's summarized at pages 14 and 15 of our brief. And it adds up to about, all the percentages add up to about 65 to 70%. But, again, this court has established that it's the preponderance that counts. What is the major preponderance of time spent? And that's spent directing and assigning at their employees. The other stuff you can add to it because it's also supervisory. And I might say it's also supervisory in terms of the proof status. There was testimony at the hearing regarding proof status. And the testimony, a lot of testimony, actually. And it was at transcript 9090. No, I'm sorry. It was at transcript 22021. And, particularly, just to answer it, they discussed proof of status and the lead to discipline. And the answer, one of the answers was, because by policy a supervisor has the authority to question and request at any given time proof of proper use of sixty, this is a step further for an employee that obviously is a pattern and the supervisor feels the need to put that employee on proof status. Again, an independent discretionary decision. Counsel says you forfeited that argument. I didn't handle this below. I can only tell you that we didn't forfeit it, nor do we forfeit any of the other. He mentions one other matter. We have argument and facts on all of those issues. I don't know what he's talking about there. But I did not handle this below. I'd have to look to the record to see whether it was forfeited. All I can point to is the testimony that was adduced at the hearing with respect to proof status. But even without proof status, you have oral reprimands. You're involved as discipline in this case. Admitted. And even the first step in the grievance proceeding as to that oral reprimand is handled by these field technicians. I just wanted to say that we rely upon our briefs for the authority to exclude Joe Afti. In this case, you can see from all the briefs, including the ILRB's brief, that he spends 80% to 85% of his time assigning works to his subordinates. And he also monitors and evaluates his subordinates' work performance, approves and denies time off, and determines whether overtime is required. So, I mean, there's a guy, admittedly, undisputedly, that won technical manager 6, Joe Afti, that should definitely be excluded. Thank you very much. Thank you, counsel. We'll take this matter under advisement and stand at brief recess until the readiness of the next case.